Good morning. I would like to reserve the last two minutes for rebuttal. You may. May it please the Court, my name is Vitaly Segal. I represent the petitioners, the Zhuk family. This is an unfortunate situation, factually, and it's one where if the result is allowed to remain as it is, the results are chilling and unequitable. I can't remember, but did you represent the Zhuks at the hearing? Yes, Your Honor. Okay, so we know from the hearing that the fellow, Mr. Zhuk, he got withholding and cap relief. As did the wife, Your Honor. As to Ukraine. But as to Ukraine. Only as to Ukraine. Okay, now there's one thing I want to understand, and that is that just because, unlike asylum, the wife doesn't get the benefit, the spouse doesn't get the benefit of the withholding order. The way it works is, no, it does not go on to the other family members. The judge independently granted her relief from Ukraine because she was living in Ukraine at the time with her husband. However, withholding, unlike asylum, it's still an order of removal with a withholding grant, meaning that they cannot, based on treaty, cannot remove somebody to a country where they're going to be harmed. Because she had a third country, Peru, where the male petitioner, her husband, and her two, now three, U.S. citizen children probably have no means of even immigrating with her. She was ordered removed to Peru. Okay, now at the end of the hearing, the I.J. asked about whether she had the capability of filing her own asylum petition, or her own, I guess that's what it was he asked at the end of the hearing. And there was some dialogue about events happening to her family in Peru, I guess her cousin or something. Her uncle. Her uncle. And the I.J. asked whether or not there would be an, whether or not you desired to file a petition for her. Nothing came of that. Well, at the time, there was two hearings on this case. The first was the master count hearing in April. The second was the merits for trial hearing in June. A little over two months had gone by. The female petitioner was writing on the male's asylum application and basically going with that. Maybe a day or two at the trial prep session in my office before the hearing, she starts to mention her uncle in Peru. At that point, this case is a two-month-old case in Los Angeles Immigration Court where currently cases are dragging on for about four years. We come into the immigration court, we tell the judge, and this goes on off the record. We say, Your Honor, we'd like more time to develop this case. He yells, Denied. I have no other cases planned for today. I want you to go forward with this case today. At that point, and now it's understandable, she has an uncle that was killed. It was part of the military in Peru. Her husband, on the other hand, in Ukraine, has been arrested, has been beaten, so obviously she's going to go with his application. She's not going to state that because they're under the assumption that withholding works for both of them to stay in the United States. It's only after we discover this that we ask the judge, I want to do some research. I want to find out what exactly happened to her uncle in Peru, to her family in Peru. Does she, in fact, have a basis to fear returning to Peru? And that's the opportunity we weren't afforded. Okay, so in the intervening years, have you filed an application to reopen before the board? Claiming that there are exceptional circumstances or changed country conditions or something, or to go over the one-year bar? Well, and it's interesting that the BIA mentions that we have the right to motion to reopen. The standard for motion to reopen is newly discovered evidence or changed country conditions. But the answer is no, you did not file. No, Your Honor, I did not. On the basis that there are no changed circumstances or new country conditions because we brought this up at the trial. It would have been denied. And there are no other exceptional circumstances. Let me ask you this. What are you asking us to do? I understand, Your Honor, that the law says that the judge might have ruled appropriately under the standards. However, U.S. immigration law has an eye on keeping families together. This case has the power to make a narrow finding that in the event that one family member is granted withholding and the other has a third country where she can be removed, that that is not equitable. That is not appropriate. Let me ask you this. Is there a mechanism to go before the district director and ask the district director to grant her some discretionary relief, parole her into the United States or something? There's humanitarian parole, which is a very limited basis, which is good for one year, and it's rarely granted. It basically, no. The only remedy we have is to ask this court to conclude that. How about with respect to his claim of reopening his claim with respect to changed country conditions in the Ukraine? Well, he was granted withholding. So, I mean, he was granted withholding because he didn't file within the one-year statute. Now, we're going to concede that this court doesn't have jurisdiction to look at the judge's decision based on whether or not he had an exceptional circumstance on filing within the one year, and he didn't. But as a result of that, as a result of that mechanism of law, we're going to break up a family, and we're going to have a situation where they can't go to Ukraine because they fear harm. He and his children have no basis to immigrate to Peru. Basically, this family is going to live separately, despite the fact that they were granted by an immigration judge relief from removal. Well, they were granted relief from removal to Ukraine. Absolutely. You're saying they have no basis to live in Peru. That's their decision. Well, no, they have. And, again, according to my clients, he's even looked into that when they were deciding, when they were leaving Ukraine, and Peru has a limited scope of, you know, just like America, just like most countries, he might not be able to immigrate to Peru, and neither will his children. He might. Okay.  You would like this court exercising some form of law of equity, as I understand it, to create a hardship exception for breaking up the family. Yes, Your Honor. That's exactly the argument we're making. And there's no case precedent you have for them. I wish I could come up with some case precedent, but there isn't. The only precedent I have is that the goal of immigration laws in America, while it is to control immigration, while it is to control the flow of illegal immigration and keep people from taking advantage of our laws and our due process and our system, it is also designed to keep families together. Now, believe me, I believe the board, I think the board noted that they thought it was unfortunate. Isn't that correct? Yes, Your Honor. They felt constrained by the law. They even stated so in their decision that we understand that by keeping the ruling as it is, that we're going to break up this family, but there's nothing we can do. I believe this court can do something, and that's basically what we're asking to do. From your perspective, there's no administrative relief available to her? No, Your Honor. There's absolutely no administrative relief. No I-130 adjustment of status potential? Nothing. An I-130 is when you're married to a United States citizen or somebody with a green card. A United States citizen would give her immediate relief. Her husband is neither. Withholding of removal, the nature of that relief is such that a lot of people stay here all their lives on that status. They might or might not have a basis later to adjust their status to that of a lawful permanent resident, green card holder, and later on achieve U.S. citizenship. Withholding of removal gives you no basis. The only thing withholding of removal allows you to do is stay in the United States. As a matter of fact, if you leave the United States, you could lose your withholding. So it does not, it is not in the mail petitioner's near future that he's going to obtain any type of lawful status other than that. How old are the children today? The children, and I don't want to give you the wrong guess, they were small children at that time. I believe the oldest one would be 12 years old, 10 years old. Then there's some, one is around between five and seven. And they also, between the time of this case and today, they had another child. So there's three United States citizen children. Three United States citizen children. Okay. And. Okay, why don't you save the remaining time. We'll hear from the government. Thank you, Your Honor. Thank you for your time. Okay. Good morning, Your Honors. May it please the Court, my name is Kevin Conley, and I represent the Attorney General in this matter. In their initial, in their opening brief, the petitioners argue that they were not given enough time to present their claims. We would take issue with that in that at the time that this case began, the first hearing in April of 2003, I believe, the individuals only presented a claim for asylum and withholding from Ukraine. That asylum application and withholding was fully litigated before the immigration judge. And, in fact, the immigration judge at that initial hearing in April raised the issue of asylum and withholding for the female respondent who was told and put on notice at that time, which was the initial calendar hearing, that the country of removal was designated as Peru. In the intervening time, they did not file an I-589 application for asylum from Peru, instead relying on the application for asylum and withholding from Ukraine, which, again, was fully litigated at the hearing. Now, counsel for the petitioner also said at the June hearing that it had come to light, between the time of the April hearing and that hearing, that the female respondent had some sort of claim or thought there was some sort of reason why she could not return to Peru. Her uncle. As it turns out, her uncle was killed in 1998, which was five years prior to this particular hearing, or the time this case had even reached the hearing stage. At that point, the IJ asked why there was not an I-589. Did he anticipate filing an I-589? The counsel represented that they were still going to go forward on the application for Ukraine. It was only at the end of the second hearing, the merits hearing, that the issue was raised, that the petitioner's counsel wanted to have more time or said, actually, that if I was given the opportunity, I would investigate whether or not she has a claim. It wasn't even clear at that time to the immigration judge whether or not the petitioner actually intended to file an I-589 application. And at that point, even an asylum application to Peru was three and a half years past the date that they had last entered the United States and could very well have been denied on the basis that it was untimely, which may or may not have given her the opportunity to get withholding from Peru, but would not have given her the opportunity necessarily to apply for or to receive asylum from Peru. The petitioner also argues in their opening brief that it was a last-minute change to the country of deportation. That is not the case at all. As the record clearly indicates, the petitioner was put on notice or petitioners were put on notice that the country of removal for the female respondent was Peru. The petitioner's counsel or petitioner also said that the merits hearing focused on the asylum application from Ukraine. And the reason that that was true is because that's the only application that was before the court at that time. There was never any I-589 application from Peru. Did you read the transcript of the hearing? Did you read that to mean that the IJ was offering him the opportunity to file an asylum application on behalf of the female? I believe that the IJ had been asking that question throughout the proceedings, starting at the April hearing and moving into the June hearing. And, in fact, at one point had said, you know, why is there not an I-589 application that I should consider abandoned at this point? I don't know that he was giving him an opportunity to file that, but I think he wanted to know if they intended to file an I-589 because he even pointed out to the petitioner that they had an opportunity to reopen this case within 90 days of the date of this hearing. And that motion to reopen may, you know, if it had been, if the petitioner had so moved, the I-589 application to Peru was not litigated at that, so that they did have an opportunity to reopen before the board, but chose not to go that route. Now, I asked counsel whether there was anything administratively that could be done to keep the family together. And he said no. Is that correct? As far as I know, there is not. There's no sort of extreme discretionary relief that the district director has that could allow the family to remain together? I don't think that there's any reason that they could not petition to do that, but I'm not sure what the success rate of that is. Who would they petition? I'm sorry, Your Honor? Who would they petition? I don't know off the top of my head because I've never had to deal with that situation before, but I think that what they would do is they would move, they would go to the district director for the district in which the case originated and ask if they would jointly move to reopen, which has happened in the past, and remand the case to the board. And that has happened in the past. So if the government and the petitioner jointly move, that would certainly increase the chances based on what we know of the process. Is that correct? I believe it would, Your Honor, and that has happened in other cases. The board itself acknowledged that they regretted this outcome, put that in their opinion. We don't see that normally. That's correct, Your Honor. We have in the past through our mediation unit been able to use that facility to bring the government and the petitioner together on these issues of, let's say, humanitarian circumstances, and sometimes a joint petition is issued from that. Would the government be amenable to trying that? I can't speak for the district director or whoever this is. Why don't you check that out along with your other homework and see if because it does seem a situation where, and I will acknowledge that the immigration judge, Judge Anderson, did a very good job of calling out the issue. So this is not the immigration judge's fault. But the BIA itself has noted expressed regret about the consequences here, and if there is any basis on which there might be an opportunity to give the BIA a chance to act on its regret, then this might be the appropriate case for a joint petition to it to take another look. I agree, Your Honor, and I think, Bill, that what else should be noted is that this is now in 2008, and the petitioner has not taken any steps to try, any apparent steps to try and rectify the situation or to look into any of these administrative matters. That may be. His explanation, whether you accept it or not, was he didn't feel he had a winning motion to present to them that it would have been futile, and whether or not that's true, I don't know. But we do know, we've been told in other cases that unilateral petitions to reopen have a much lower level of success rate than joint petitions to reopen.  So in any event, mediation doesn't require any agreement. There has to be agreement to mediate, but there's no, as you know, mediation doesn't require that you come to an agreement, but it does seem it might be an opportunity, and why don't we give you, we'll give you some time to check with your superiors or your client and see whether our mediation unit might be helpful in bringing the people together. Just so I'm clear, Your Honor, you want me to find out if the district director would be amenable to a joint motion to reopen? You can convey that the panel would be interested in hearing whether they would agree to try to mediate an outcome here that might be able to keep the family together. Very well, Your Honor, I will make sure that I take that up. At least present it to the board so that the board can make that decision. Yes, Your Honor. All right. Is there anything else? Thank you very much. Your Honor, we appreciate any, you know, any meaning of stuff halfway on this case. We're open to any type of mediation. The one thing I want to make abundantly clear to this Court, though, is because of the way the law is structured, all we can do is ask. We know that. We want you to ask. And we will ask. Be optimistic. Okay. Be optimistic, you know. Here's the situation that you've got. Our government, an immigration judge has determined that the male, Mr. Zhuk, is entitled to remain here, should be allowed to remain here in this country. He won't be removed to Ukraine or wherever it is for whatever, you know, for all the reasons that are stated in the I.J.'s opinion. And apparently the I.J. made that decision based on good reasons, good grounds. And everybody seems to be sensitive, everybody in this administrative process seems to be sensitive to the fact, and in these unique circumstances, that they can't afford such relief, although they can afford such relief to the female regarding Ukraine, they can't do it with respect to Peru. But nonetheless, everybody seems to be aware that this will break up the family. And it just seems, there seems to be a sensitive, as Judge Fisher said, we don't see very often the board expressing many regrets. So maybe there is something here in the deep bellows of the Department of Justice. No, it's DHS. Whatever it's called. They can work something out. So try it. We hope so, Your Honor, but with the understanding that We understand your position, but We're more than willing to listen, Your Honor. All right. Thank you for your time, sir, Your Honor. Case argued as submitted. Can I ask one question? Yeah. If, for some reason, a joint motion to reopen does not occur, or mediation is not successful, will we need to return to this? Yeah, well, there will be a mediation order that will give you all of the The mediation unit takes care of it and works with us. We don't get involved in mediation, but yes, there's a process. DHS is familiar with it. They developed a protocol that the district directors are aware of that involves the mediation process. They're familiar with it. That doesn't mean they always agree to it, or that if they mediate, they agree to a resolution. But there have been some cases where there is a success rate. Yeah. We'll send an order out to you. All right. Thank you. Case argued as submitted. Thank you. Next case on calendar, White v. Woodford.
judges: Fisher, Paez, Robart